**MONIQUE C. WINKLER**
**JASON H. LEE**
**DAVID ZHOU**
**MARC D. KATZ**
**YOONA KIM**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE**
**COMMISSION**
**San Francisco Regional Office**
**44 Montgomery Street, Suite 2800**
**San Francisco, CA 94104**
**Telephone: (415) 705-2500**
**Facsimile: (415) 705-2501**
**Email: katzma@sec.gov; kimyoona@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br>        **Plaintiff,** <br><br>     **v.** <br><br> **LAURA TYLER PERRYMAN,** <br><br>        **Defendant.** | **COMPLAINT** <br><br> **1:23-cv-10985** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Laura Tyler Perryman ("Perryman"), alleges as follows:

## SUMMARY

1.     From April 2018 through July 2019, Perryman fraudulently raised approximately $41 million for Stimwave Technologies Incorporated, a privately held medical device startup formerly based in Pompano Beach, Florida ("Stimwave" or the "Company") that Perryman co-founded in December 2010 and led as its then-Chief Executive Officer.

2.     Specifically, during Stimwave's Series D funding round (the "Series D Funding"), Perryman made materially false and misleading statements to investors about one of Stimwave's key products, a neurostimulation device system that used electrical currents to treat chronic pain in peripheral nerves away from the spinal cord (the "PNS Device").  Perryman knew, or was

reckless in not knowing, that a primary component of the PNS Device—a receiver implanted inside patients' bodies to help capture and amplify electrical signals—was, in reality, a fake, non-functional piece of plastic (the "Fake Receiver"). Indeed, Perryman directed and approved the creation of the Fake Receiver to include as part of the PNS Device so that doctors, who purchased the PNS Devices and unwittingly implanted the Fake Receiver in patients, could obtain significant reimbursement amounts from health insurance programs. Those reimbursements made it possible for Stimwave to charge doctors higher prices for the PNS Devices compared to the devices without a receiver.

3.     Perryman misleadingly told investors that the PNS Device was the only effective peripheral nerve stimulation device on the market, and that the PNS Device, which included the Fake Receiver, had been approved by the U.S. Food and Drug Administration ("FDA"), which regulates medical devices. In fact, the Fake Receiver was never cleared by the FDA.

4.     Perryman also made numerous misrepresentations that gave investors the false and misleading impression that the Company's products and its business model, which depended on health insurance reimbursements to doctors for device implantation procedures, would generate reliable revenue. In addition, Perryman overstated Stimwave's historical revenues and revenue projections to investors.

5.     Perryman was the Company's main point of contact for investors during the Series D Funding. Investors invested millions of dollars in Stimwave based on her misrepresentations.

6.     Perryman resigned as CEO in November 2019 after, among other things, her role in the inflation of Stimwave's historical revenues came to light. Stimwave eventually initiated a voluntary recall of all its PNS Devices in July 2020. The Company subsequently filed for Chapter 11 bankruptcy protection in June 2022, sold most of its assets, and ceased its operations.

7.     By her actions, Perryman violated the antifraud provisions of the federal securities laws, specifically Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.     The Commission seeks a final judgment: (a) permanently enjoining Perryman from violating the federal securities laws and rules that this complaint alleges she has violated; (b) permanently enjoining Perryman from, directly or indirectly, including, but not limited to, through any entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Perryman from purchasing or selling securities for her own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)]; (c) ordering Perryman to pay disgorgement with prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Perryman to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (e) prohibiting Perryman from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Perryman, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

12.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District.  For example, Stimwave offered and sold securities in this District, including to an investor in the Series D Funding who is based in this District; Stimwave solicited and sold its devices to doctors and medical practices located in this District; and Stimwave caused medical providers to seek reimbursement from health insurance programs for implanting Stimwave devices in residents of this District.

## DEFENDANT

13.     **Laura Tyler Perryman**, age 55, is a resident of Delray Beach, Florida. Perryman co-founded Stimwave in December 2010 and served as CEO through November 2019, when she resigned.  Perryman also served as a director and co-Chair of the Stimwave Board of Directors.

## RELATED ENTITY

14.     **Stimwave Technologies Incorporated**, a Delaware corporation founded in 2010, formerly had its principal place of business in Pompano Beach, Florida.  In June 2022, Stimwave filed for Chapter 11 bankruptcy protection in bankruptcy court in Delaware.  Stimwave is in the process of winding down its business after selling substantially all of its assets pursuant to an auction and sales process approved by the bankruptcy court in September 2022.

## FACTS

I.      **Stimwave's PNS Device and Business Model**

15.     Perryman co-founded Stimwave in 2010 to develop, manufacture, and sell neurostimulation devices used to treat chronic pain by utilizing electrical currents to block pain signals from reaching the brain.

4

16.     During all times relevant to this complaint, Perryman directed and controlled all important aspects of Stimwave's operations, product design, finances, and investor relations.

17.     By the start of the Series D Funding in 2018, the PNS Device was one of the Company's main products.  The PNS Device targeted peripheral nerves located away from the spinal cord and in smaller parts of the body, such as elbows and feet.  The PNS Device consisted of three key components: (1) an external transmitter powered by a battery; (2) an implanted receiver; and (3) an implanted electrode array, also referred to as a lead.  The transmitter and battery were packaged in a wearable pouch and sent a wireless signal into the body.  The two implanted components worked together to receive the signal and convert it into electrical currents to create an electrical energy field that acted on target nerves.  The receiver was supposed to amplify the signal from the external transmitter by helping capture and transmit the signal to the lead, which then generated the electrical currents to stimulate a problematic nerve.  The lead itself could capture the signal from the external transmitter, but its range was limited without the receiver.

18.     Stimwave's business model was based on selling its devices to doctors and other healthcare providers, who would implant the devices in patients.  The doctors, in turn, obtained reimbursements from health insurance programs for performing the implantation procedures.  For the PNS Device, Perryman and others at Stimwave informed doctors that they could bill insurance separately for the implantation of the receiver and the implantation of the lead.  The reimbursement rates were approximately $16,000 to $18,000 for the receiver, and approximately $4,000 to $6,000 for the lead, which resulted in a total reimbursement ranging from about $20,000 to $24,000.  Given these reimbursement rates, Stimwave generally sold its baseline PNS Device at or around $16,000, with the final prices ranging from approximately $12,000 to over $21,000 depending on the customer and the inclusion of add-on components.

**II.     Perryman Directed Stimwave Employees to Develop a Fake Receiver That Served No Medical Purpose.**

19.     The original version of the PNS Device included a single, functional receiver, which had a copper core and was encased in plastic (the "Functional Receiver").  In August 2017, the FDA cleared the original device for commercial distribution.

20.     Not long after the original PNS Device was released for sale, doctors complained to Stimwave that the Functional Receiver was too long to implant in certain small spaces in the body.  Because the Functional Receiver had a copper core, it could not be cut down.

21.     Perryman understood that doctors' concerns over the size of the Functional Receiver threatened Stimwave's ability to maintain its existing pricing for the PNS Device. Because the reimbursement rates for implanting only the lead were approximately $4,000 to $6,000, it would not be economically viable for doctors to purchase the PNS Device if there was a risk that they might not be able to implant and get reimbursed for the Functional Receiver.

22.     In response, Perryman directed Stimwave employees to create the Fake Receiver, which was smaller than the Functional Receiver and could be trimmed down even further because it was solely a piece of plastic.  Perryman reviewed and approved internal design documents that made clear the Fake Receiver was nothing more than a cylindrical piece of medical-grade plastic, without copper or any other functioning parts.

23.     At Perryman's direction, both the Functional Receiver and the Fake Receiver were included as part of the PNS Device beginning in or about spring 2018.  Stimwave did not submit this modification of the original PNS Device to the FDA for approval.

24.     Even though Perryman knew, or was reckless in not knowing, that the Fake Receiver was not functional and served no medical purpose, she encouraged, and directed Stimwave employees to encourage, doctors to implant the Fake Receiver whenever the space in a patient's body near the target nerves was too small to fit the Functional Receiver.  Perryman also encouraged, and directed her employees to encourage, doctors to bill health insurance programs for implanting the Fake Receiver.

6

25.     Perryman did not inform doctors that the Fake Receiver was not functional.  As a result, she caused doctors and other medical providers to unwittingly submit fraudulent claims for health insurance reimbursements between 2018 and 2020 for performing unnecessary surgeries to implant useless plastic components into patients' bodies.

III.    **Perryman Misled Investors About the PNS Device and Stimwave's Business Model During the Company's Series D Funding Round.**

26.     Perryman actively promoted the Series D Funding and served as the main point of contact for investors.  She personally participated in several in-person site visits as well as presentations, phone calls, and e-mail communications with prospective investors.  Perryman also created and/or signed off on all written Series D Funding materials, including pitch decks and unaudited financials.  The offering raised approximately $41 million between April 2018 and July 2019 from 10 investors who purchased shares of Stimwave's Series D Preferred Stock.

27.     The Series D Funding was particularly important for ensuring the Company had cash on hand at that time.  For example, in 2018, the Company reported a net operating loss of nearly $20 million and would have ended the year with a negative cash flow without the influx of investor funds raised during the Series D Funding.  Instead, because of the funds that Perryman raised based on misrepresentations, the Company ended the year with approximately $6.7 million in cash.  Then, in the first half of 2019, Perryman provided investors with false and misleading financial projections for the year that concealed the fact that Stimwave would run out of cash by around January 2020 without additional liquidity.

28.      During the Series D Funding, pitch decks and other written materials that Perryman approved and provided to investors explained that the PNS Device could be implanted in small spaces in the body because it did not require a bulky implanted battery and instead relied on an implanted receiver and lead to capture an external signal and create electrical currents for the target nerves.  However, Perryman knew, or was reckless in not knowing, the fact that one of the two receivers included with the supposedly groundbreaking PNS Device was, in truth, fake and served no function, and that Fake Receivers were being implanted in patients' bodies

through medically unnecessary surgical procedures. Still, Perryman falsely touted Stimwave's PNS Device as the only effective peripheral nerve stimulation device on the market that would quickly make up a majority of Stimwave's revenue and drive future growth.

29.     Perryman also misrepresented to investors that the PNS Device, which already included the Fake Receiver during the Series D Funding, had been FDA approved. As described above, the FDA only cleared the original version of the PNS Device that had the single Functional Receiver. Perryman knew, or was reckless in not knowing, that Stimwave never submitted its modification of the original PNS Device to the FDA for review, and that, as a result, the version of the PNS Device with the Fake Receiver had never been approved by the FDA for commercial sale.

30.     Perryman also gave investors the false and misleading impression that Stimwave had a reliable business model that depended on its customers obtaining health insurance reimbursements, which is a well-established source of revenues in the healthcare industry. Perryman told investors that doctors were reliably obtaining reimbursements totaling around $20,000 to $24,000 for implanting the lead and the receiver, and, as a consequence, Stimwave was able to charge doctors approximately $16,000 for the PNS Device. However, as explained above, Perryman knew, or was reckless in not knowing, that the Fake Receiver was included with the PNS Device and that some doctors were unwittingly submitting fraudulent reimbursement claims for implanting a non-functional piece of plastic into patients. Once doctors and insurance programs learned the truth about the Fake Receiver, doctors would stop implanting the fake component and likely stop buying Stimwave's PNS Devices all together, and insurance programs would stop paying reimbursements for the implantation procedures for the PNS Devices.

31.     Perryman's misrepresentations and other deceptive conduct regarding the PNS Device and Stimwave's business model were important to investors because they were directly related to the viability of Stimwave's business and, therefore, the likelihood that investors would obtain a return on their investments in the Company.

**IV.     Perryman Also Made Misrepresentations to Investors About Stimwave's Revenues and Revenue Projections, Which Came to Light When Her Fraud Unraveled.**

32.     Perryman also provided investors with false and misleading information about the revenues that Stimwave had earned from sales of its devices as well as the projected revenues that it was expecting in the future.  Investor materials and financial statements sent to investors by Perryman included revenue numbers that were significantly overstated.

33.     During all times relevant to this complaint, Perryman controlled and managed key aspects of Stimwave's financial statements and sales records.  She had her own password to personally input financial information into the Company's bookkeeping software, which was used to keep track of revenues and cash flow numbers.  She also personally interacted with the doctors and medical practices that bought Stimwave's products, and even signed sales contracts that set forth the negotiated prices each customer had agreed to pay.

34.     In the fall of 2019, Perryman came under increasing pressure from Stimwave's Board to professionalize the Company's accounting and finance departments, which Perryman largely ran by herself.  In addition, in or around October 2019, Stimwave received a civil investigative demand for documents from the U.S. Attorney's Office for the Southern District of New York in connection with an investigation of the Company.

35.     Around the same time, Perryman admitted to the Board that she had been overstating the Company's revenues.  For example, when Stimwave made a sale of its products, Perryman would at times record in its books the higher list prices of Stimwave devices rather than the lower, negotiated contract prices.  Because Perryman signed the sales contracts, she knew, or was reckless in not knowing, that the negotiated prices were less than the list prices.

36.     In the wake of these revelations from Perryman, the Stimwave Board initiated an internal investigation of the Company's operations and its finances, and Perryman resigned shortly thereafter from her position as CEO in November 2019.  The internal investigation concluded, among other things, that, in 2018 and 2019, Perryman had misdirected Company funds to her personal bank accounts totaling more than $1.2 million beyond the salary and

bonuses she was entitled to under her compensation arrangement.  The investigation also found that the Company's revenues for 2018, which Perryman had previously reported internally and to investors as being approximately $34 million, were in reality closer to about $22 million. Furthermore, the investigation determined that Perryman had significantly overstated Stimwave's revenues for the first half of 2019 and revenue projections for the rest of the year, both of which were shared with at least certain Series D Funding investors.

37.    Perryman knew, or was reckless in not knowing, that the Stimwave revenue figures that she provided to investors were false and misleading at least in part because she had personally improperly recorded higher revenue figures based on Stimwave devices' list prices in the Company's accounting records when those devices had in fact been sold for lower negotiated prices.

38.    Perryman's misrepresentations and other deceptive conduct regarding Stimwave's finances were important to investors because they were directly related to the viability of Stimwave's business and, therefore, the likelihood that investors would obtain a return on their investments in the Company.

39.    In July 2020, Stimwave, in coordination with the FDA, announced a voluntary recall of all its PNS Devices that contained the Fake Receiver, which covered approximately 5,600 devices.  Then, in June 2022, Stimwave filed a Chapter 11 bankruptcy petition.  In September 2022, the bankruptcy court approved a sale of substantially all of Stimwave's assets. Following that sale, Stimwave has been winding down its business.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

40.    The Commission realleges and incorporates by reference paragraphs 1 through 39.

41.    Perryman, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

a.  Employed devices, schemes, or artifices to defraud;

b.  Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c.  Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

42.     By reason of the foregoing, Perryman violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act)

43.     The Commission realleges and incorporates by reference paragraphs 1 through 39.

44.     Perryman, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails:

a.  with scienter, employed devices, schemes, or artifices to defraud;

b.  obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

45.     By reason of the foregoing, Perryman violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter an order permanently enjoining Perryman from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

II.

Enter an order permanently enjoining Perryman from directly or indirectly, including, but not limited to, through any entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Perryman from purchasing or selling securities for her own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

III.

Enter an order requiring Perryman to disgorge all ill-gotten gains received as a result of her unlawful conduct plus prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

IV.

Enter an order requiring Perryman to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

Enter an order prohibiting Perryman from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

## **JURY DEMAND**

The Commission demands a trial by jury.

Dated: December 19, 2023

Respectfully submitted,

_____

Yoona Kim
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION